## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## Richmond Division

### UNITED STATES OF AMERICA

v.

Case No. 3:17cr71

### MELVIN LEE JONES,

Defendant.

### MEMORANDUM OPINION

This matter comes before the Court on Defendant Melvin Jones's Motion to Suppress Statements and Evidence (the "Motion to Suppress"). (ECF No. 14.) In the Motion to Suppress, Jones seeks to suppress both physical evidence and statements arising from an encounter with Richmond Police officers at a residence on August 24, 2016. For the reasons that follow, the Court will deny the Motion to Suppress.

## I. Procedural History and Findings of Fact

### A. Procedural History

On June 6, 2017, a grand jury indicted Jones on two counts: (1) Possession with Intent to Distribute Cocaine Base in violation of 21 U.S.C. § 841(a)(1); and, (2) Possession of a Firearm by a Convicted Felon in violation of 18 U.S.C. § 922(g)(1). (ECF No. 1.) An arrest warrant issued the next day. (ECF No. 4.) On October 10, 2017, Jones was arrested and released on personal recognizance to a third party custodian. (ECF No. 10.) On November 13, 2017, Jones filed the Motion to Suppress, (ECF No. 14), and the United States responded, (ECF No. 17). On December 7, 2017, the Court held an evidentiary hearing on the Motion to Suppress (the "Hearing"). (ECF No. 19.) The Court then ordered supplemental briefing which the parties timely filed, (ECF Nos. 26, 27), and heard oral argument on January 24, 2018. At oral argument,

the Court ordered further supplemental briefing, which the parties ultimately filed timely. (ECF Nos. 29, 32.)

## B. Findings of Fact

In May 2016, the Richmond Police Department received an anonymous complaint through the Department's "Gun 250 Program"[1] naming Melvin Jones as a person selling marijuana and crack cocaine out of a residence located at 3008 Berwyn Street (the "Berwyn Street residence"). The complainant claimed that he or she had seen Jones selling narcotics as well as cooking them, that Jones kept cooking utensils in a safe in a closet of the residence, and that he stored drugs throughout the house. The complainant also reported that Jones kept a handgun either on his person, in his dresser, or under his mattress, and that he hid a camera on the porch in order to see who approaches the home.

On the afternoon of August 24, 2016, after confirming that Jones had ties to the Berwyn Street residence, three Richmond Police officers, all in uniform—Officer Jonathan Myers, Officer Jason Pritchard, and Officer Hogan—went to the Berwyn Street residence to investigate the complaint.[2] Officer Myers was familiar with Jones from prior interactions and "knew his face." (Hr'g Tr. 57.) Officer Pritchard wore a body camera, which was running and recording throughout the entire encounter with Jones.

---

[1] The Gun 250 Program is an anonymous hotline run by the Richmond Police Department and is designed to incentivize citizens to report illegal guns in their community. If a complaint results in the seizure of a firearm, the complainant is given a $250 reward for each firearm seized.

[2] Officer Myers characterized the visit to the residence as a "knock-and-talk" and stated that no surveillance had previously been done on the house. (Hr'g Tr. 61–62, ECF No. 20.)

Officer Pritchard and Myers both testified that Detective Daniel Awad was with them for the initial knock-and-talk. However, Detective Awad testified that he was not there for the initial encounter and arrived at the scene after Jones was already detained. A review of the body camera footage confirms that Detective Awad was not present for the knock-and-talk and arrived on the scene sometime after. This testimony, though incompatible, did not negatively impact the credibility of either Officer Pritchard or Officer Myers.

2

The three officers approached the front door of the residence, climbing up a short flight of stairs to a covered porch. The front door of the house was made of solid wood and had an external screen door. Officer Pritchard, standing to the left of the door, held the screen door open while Officer Myers, standing directly in front of the doorway, knocked on the solid wood front door.[3] Officer Myers did not say anything when he knocked on the door. Within ten seconds, Jones opened the door and stood in the threshold. Officer Myers testified that, upon the door opening, he "immediately smelled marijuana coming from the residence."[4] (Hr'g Tr. 63.) After opening the door, Jones spoke first, asking Officer Myers, "How you doing, man?" (Body Camera Tr. Clip 7 at 1, ECF No. 21-1.) Officer Myers responded, "Are you good? . . . Are you smoking up in there?" (*Id.*) Before Jones responded, Officer Myers reached for Jones and grabbed him by the left arm. With Officer Pritchard's assistance, Officer Myers handcuffed Jones's hands behind his back, and sat him on a chair on the porch. At the moment Officer Myers grabbed Jones's arm, Jones was standing on the metal door jamb of the front door, and Officer Myers had one foot on the metal door jamb and the other foot on the porch.

After Officer Myers had detained Jones on the porch, Jones said, "my niece and my nephew are back there," indicating toward the house. (*Id.*) Officer Myers asked if they were young, and Jones said that they were. Officer Myers then asked Jones two times if any adults were in the house, and Jones responded twice that there were not. Jones called to the two

---

[3] Officer Hogan likely was on the steps directly behind Officer Pritchard, but he is out of the frame of the body camera. (*See* Pritchard Test., Hr'g Tr. 13 ("There might have been Officer Hogan behind me possibly.").)

[4] In his testimony, Officer Pritchard confirmed Officer Myers's observation, saying that he immediately smelled marijuana once Jones opened the door: "As soon as the door opened, it kind of emanated from inside [the] residence. Probably within the first couple of seconds." (Hr'g Tr. 12.) In the warrant, Officer Myers characterized the odor of marijuana as "strong." (Warrant 5, ECF. No. 14-1.)

3

children to come to the front door, which they did, and Officer Pritchard directed the children to sit on the porch.[5]

Officer Myers then indicated that he was going to "clear" the house. The following exchange occurred:

| | |
|---|---|
| OFFICER MYERS: | I'm going to take a look. Yo, we've gotta clear it. |
| MR. JONES: | You got a warrant or something? |
| OFFICER MYERS: | It smells like weed. |
| OFFICER PRITCHARD: | We don't need to get a search warrant. |
| MR. JONES: | I don't get a search? Did you get a call or something? |
| OFFICER MYERS: | We have a complaint. A drug complaint. |

(*Id.* at 2.)

Officer Myers then conducted the search, which lasted about two minutes. Officer Myers testified that he cleared the residence

[f]or safety reasons. The second I smelled marijuana based on the complaint leading up to the knock-and-talk, and then the smell of marijuana coming from the house, my intention at that point was to, one, obtain consent from the resident of the house or obtain a search warrant. So if that's what we were going to do, we were going to clear the house and just make sure there was nobody in there just for safety reasons while we waited to obtain the warrant.

(Hr'g Tr. 64.) On cross examination, Officer Myers further testified that he swept the house even after Jones had told him there were no other adults in the home

[b]ecause we're going to be there for a while getting this search warrant. For safety reasons, I'm not taking his word. We have enough to clear the house and make sure nobody else is in there as a threat. . . . Based on the smell coming from the house, the door already being opened by a resident inside, we have enough to

---

[5] About twenty minutes later, the children's grandmother arrived and took them from the scene.

4

detain all occupants inside and make sure that the house is secured before I go and obtain the search warrant.

(*Id.* at 82.)

During his sweep of the house, Officer Myers did not find any people, but he did see a "very small portion" of a smoldering cigarette on top of a trash can in the kitchen that, "based on [his] training and experience," Officer Myers recognized as marijuana. (Hr'g Tr. 66, 78–79.)

After he completed the sweep, Officer Myers officer came to the door of the house and asked Jones to "step inside." (Body Camera Video Clip 7 at 4:35, ECF No. 21.) Jones then stood up and walked into the house unassisted. Officer Myers followed him inside.

Officer Myers testified that he attempted to get Jones's consent to search the house but that Jones refused to give consent. Even though he did not give consent to search, the parties agree—and the body camera footage shows—that Jones was calm and cooperative during the entirety of his detention. Officer Myers then left to get a warrant.

Detective Awad, dressed in street clothes, arrived at the scene shortly after Officer Myers departed, and entered the house to speak with Jones. At this time, Officer Hogan was the only other officer in the house. About a minute later, Detective Awad left the house and went to his car, which was parked on the street in front of the residence. Approaching the house again, Officer Awad asked Officer Pritchard for a *Miranda* card. Officer Pritchard handed a card to Detective Awad. Detective Awad then entered the house again. Approximately fifteen seconds later, Officer Hogan walked out of the house. Detective Awad remained in the house with Jones alone for approximately three-and-a-half minutes[6] while Officer Pritchard and Officer Hogan

---

[6] The parties dispute the amount of time Detective Awad remained alone in the house with Jones. Jones claims it lasted six minutes, while the United States represents that only three-and-a-half minutes passed. (*See* Def.'s Supp. Br. 5, ECF No. 26; U.S. Supp. Resp. 5, ECF

stood on the porch. During this time, the wooden door to the house was open, but the screen door was closed.

About one minute after Detective Awad entered the house the second time, Officer Hogan, who was standing on the porch, made a hand gesture seemingly at Detective Awad through the screen door. It is difficult to make out from the video, but it appears that Officer Hogan motioned his thumb toward Officer Pritchard, who was standing to the right of the door out of sight of Detective Awad. Officer Hogan then pointed at Detective Awad with his index finger, then put up his fingers and walked away.[7]

While they were on the porch together, Officer Hogan remarked to Officer Pritchard:

> [Jones is] being extremely cooperative other than that. Everything he's saying is right there. You know, pretty much owned up to everything. He said, "Can I change my clothes?" I was like, "You don't know if you're going to jail or not." He was like, "I'm going to jail." He knows that there's something in there.

(Body Camera Tr. Clip 7 at 17.)

The United States questioned Detective Awad about his conversation with Jones while the two were alone in the house. When asked if Jones made any statements in response to questioning prior to being read his *Miranda* rights, Detective Awad stated that, "[a]s far as any questioning, . . . the only questioning that I did was to see if he wanted to cooperate. There wasn't a time where I recall making any specific questions pertaining to the situation until after I introduced the body camera and read Miranda to him." (Hr'g Tr. 88.) Detective Awad testified that once Jones "said that he wanted to talk," Detective Award "went and grabbed Officer Pritchard and Mirandized [Jones]." (*Id.* at 89.)

---

No. 27.) The record plainly reveals that Detective Awad was alone with Jones in the house for about three-and-a-half minutes.

[7] Detective Awad did not recall this interaction when defense counsel questioned him about it on cross examination at the evidentiary hearing. (Hr'g Tr. 97.)

When asked on direct examination if Jones made any incriminating statements prior to being read his *Miranda* warnings, Detective Awad testified:

A:      I think the biggest thing for me was that he looked remorseful . . . . He was making statements indicative to the fact that he wanted to cooperate with us to avoid bringing anyone else that lived in that house into the same trouble that he was in. I don't recall him making any statements to me where he was like, yeah, I'm a drug dealer, I got these drugs before Miranda or anything.

Q:      So the statements he was making were more leading [i]nto him possibly talking?

A:      Yes.

Q:      Versus not actually making admissions?

A:      Exactly. And that's why I went and got the body camera because to me, as a detective, I was like, [t]his is great. He's getting ready to tell us. Like, I felt like he was at the point where he was going to explain the whole situation. That's it.

(*Id.* at 89–90.)

When asked if Jones made any statements indicating that there was evidence of illegal activity in the house prior to being given *Miranda* warnings, Detective Awad testified:

[Jones] didn't make any more mention that he would have had any other type of drug that eventually would be later recovered other than the marijuana. I know that there was a firearm present, but I honestly don't remember if he had mentioned to me that he had a gun in his room before we found it or not. I just don't remember that. But I know that—I remember that day there being a firearm involved somehow.

(*Id.* at 91.)

Three-and-a-half minutes after entering the house for the second time, Detective Awad opened the door and signaled for Officer Pritchard to come into the front room where Jones was sitting. As recorded on Officer Pritchard's body camera, the following exchange occurred:

DETECTIVE AWAD:          Mr. Jones, you have the right to remain silent. Anything you say can and will be used against you

7

|  | in a court of law. You have the right to consult with an attorney, and have an attorney present during questioning. If you cannot afford an attorney, one can be provided for you before questioning at no cost. Do you understand these rights? With these rights in mind, do you wish to speak to me now? You have to answer yes or no. |

| MR. JONES: | No. (Inaudible). |

| DETECTIVE AWAD: | Well, that's—that's why I read you your rights. Because what you were saying, you know, I want to be able to help you but I can't help you without telling you your rights. There's no federal court and there's no lower court, there's no court in this country that will let me talk to you and help you without giving you your rights. Anything you said up until then, I'm not going to use because I can't. |

(Body Camera Tr. Clip 6 at 1–2, ECF No. 21-2.) Detective Awad testified that he made this

statement because

> it's important that [Jones] knows that I wasn't going to try to backdoor anything and use any statements that he made prior to Miranda against him in the court. And I wanted him to understand that. And in my mind, bringing the body camera in would help him feel more comfortable that I was being straight and honest with him because I had no intentions of using any statements that were made prior to Miranda against him or anyone that pertained to the situation.

(Hr'g Tr. 87–88.)

The conversation continued:

| MR. JONES: | Sure. Your body camera was out there. |

| DETECTIVE AWAD: | No, he was sitting outside. Anything you said up until that point, that's not on the body camera. That's why he came in just now. But it's entirely up to you. If you want to talk about it again— |

| MR. JONES: | Hey, I mean, I've been in possession of it. |

| DETECTIVE AWAD: | You've been in possession of the gun? It's your— is it your gun, yes or no? You don't have to—it's |

8

|                 | not a trick question. It's not a loaded question. Is the gun yours? |
|-----------------|---------------------------------------------------------------------|
| MR. JONES:      | I said I've been—I've been in possession of it.                     |
| DETECTIVE AWAD: | How much did you pay for it?                                         |
| MR. JONES:      | I don't know, man. There was an issue I had going on and I was upset. |

(Body Camera Tr. Clip 6 at 2.)

After watching a clip of the body camera video in which Detective Awad asked Jones,

post-*Miranda* warnings, if he was in possession if "it," Detective Awad explained:

> So like I just said that I couldn't remember, he must have said something to me to trigger that to that point . . . . I know myself and I know how I handle investigations. If he would have even started mentioning about the firearm, I would have shut him down, gotten the body camera or at least the Miranda card . . . and read him his rights in front of at least one other officer before the questioning went on.

(Hr'g Tr. 91-92.)

A few minutes later, after more questioning, Detective Awad seemed to return to the

issue of Jones waiving his *Miranda* rights:

| DETECTIVE AWAD: | But you understand that (inaudible), yes or no? We need to hear you say it if it goes to court and (inaudible). Oh, yeah, he should be (inaudible). You have to say yes or no. All right, man. Well, good luck to you, brother. |
|-----------------|---------------------------------------------------------------------|

(Body Camera Tr. Clip 6 at 5–6.)

During the questioning, the following exchange took place:

| DETECTIVE AWAD: | Man, to alleviate—and I'm cool with it either way. I said, "You've got a brick?" You said, "No." And then said, "Half a powder." You don't mean half a brick? You mean half an ounce, right? |
|-----------------|---------------------------------------------------------------------|
| MR. JONES:      | Yeah.                                                               |

9

| DETECTIVE AWAD: | Okay. All right. I was just checking with you because I can't help you then in no way, shape or form. I'm going to do everything I can to help you today. |
|---|---|

(*Id.* at 6–7.)

Officer Myers then returned with the search warrant, which the magistrate had signed at

3:16 p.m. The affidavit in support of the warrant stated, in full:

> I Ofc. Myers, was informed of a Gun250 complaint on 5-6-16. Gun250 is a program created by the Richmond Police Dept, in an effort to give citizens an avenue to anonymously report illegal guns within their community.
>
> This complaint stated that an individual named Melvin Jones (aka: Mello) was selling marijuana and crack cocaine out of 3008 Berwyn St. They stated that they have seen him sell these narcotics as well as cook them. They stated that he keeps cooking utensils in a safe in his closet. They stated that he keeps a handgun either on his person, in his dresser, or under his mattress. The complainant indicated that he has a camera hidden on his porch so he can see who is approaching his home. They stated that the drugs are typically stored in different places throughout the house.
>
> Based on this complaint, myself, along with 2nd Precincts FMT Tac Unit, conducted a knock and talk at 3008 Berwyn St.
>
> I Ofc. Myers, approached the front door of the residence and knocked. Melvin Jones answered the door. As soon as the door was opened, I could smell a strong odor coming from inside the home. Based on my training and experience, this odor was believed to be marijuana. Based on the odor, Melvin Jones was detained. A check was done of the residence in an effort to make sure there were no other people located in the residence. Two children were removed from the home. While the search was being conducted, I witnessed what was believed to be a marijuana cigarette in the kitchen trash can, sitting on the top of the trash, still burning. The smell coming from this item was also consistent with marijuana.

(Warrant 5.)

The warrant listed "Simple Possession of Marijuana[, a] violation of VA Code 18.2-

250.1" as the offense for which the warrant was requested. (*Id.* at 1.) It authorized the officers

to search for the following:

A) "Any controlled substances (marijuana);"

B) "[A]ny paraphernalia used in the use of illegal narcotics;"

C) "Any instruments used in the illegal drug usage of marijuana or any other illegal substance;"

D) "Any electronic devices used to aid in the usage of illegal narcotics;"

E) "[A]ny firearms and ammunition;"

F) "[A]ny financial records and any written records identifying any person(s) involved in the illegal drug use and/or indicating residence in the dwelling;" and,

G) "[A]ny safes or locked boxes that could aid in the hiding of illegal narcotics."

(*Id.* at 1.)

On cross examination, defense counsel asked Officer Myers about the crime listed on the

warrant:

Q: And when you wrote up the search warrant, the only statute that you asserted probable cause to believe had been violated was this Virginia law against simple possession of marijuana; correct?

A: Correct.

Q: You didn't allege any Virginia laws about firearms possession?

A: No.

Q: Or manufacturing or distributing drugs?

A: No.

Q: It's just simple possession of drugs; correct?

A: That was the initial purpose for the search[.]

. . . .

Q:      . . . If you'd had information to establish probable cause of firearms offenses or drug distribution, you would have included those, the statutes, for which you had probable cause, wouldn't you?

A:      Absolutely.

(Hr'g Tr. 74–76.)

Once Officer Myers had returned with the search warrant, Officers Hogan and Pritchard and Detective Awad searched the Berwyn Street residence. They recovered marijuana and other drugs, a handgun, and indicia of drug trafficking, including items used for packaging and weighing narcotics. The police found the handgun in a safe in Jones's closet.

While the search was being conducted, Officer Myers sat with Jones in the living room and interrogated him. Officer Myers testified that he ensured that Detective Awad had advised Jones of his *Miranda* warnings before speaking with him and that it "was [Officer Myers's] understanding [that Jones] had understood his rights." (Hr'g Tr. 68.) Jones made numerous incriminating statements about the drugs and firearm that were recovered during the search while speaking to Officer Myers.

## II. Analysis

In his Motion to Suppress, Jones alleges numerous violations of the Fourth[8] and Fifth[9] Amendments to the United States Constitution. He challenges: (1) his initial detention; (2) the warrantless sweep of the home; (3) the sufficiency of the probable cause supporting the search

_____

[8] "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.

[9] The Fifth Amendment states, in relevant part, that no person "shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

12

warrant as well as its scope; and, (4) the admissibility of his statements to the police on both Fifth and Fourth Amendment grounds. The Court will review each seriatim.

## A. The Officers Sufficiently Corroborated the Gun 250 Complaint

Because many of Jones's arguments rise or fall on whether the smell of marijuana emanating from the residence sufficiently corroborated the anonymous Gun 250 complaint, the Court will address this issue before discussing Jones's other Fourth Amendment claims. Jones argues that the smell of marijuana did not substantiate the complaint, because the complaint alleged the commercial activity of drug distribution, not recreational drug possession and use. The United States, however, maintains that the smell of marijuana sufficiently confirmed the accuracy of the complaint, meaning that the officers then had sufficient cause to believe that the other information in the complaint could be relied upon as well. Thus, the United States argues, the officers could detain Jones and reasonably rely on the additional Gun 250 complaint information that Jones distributed marijuana and cocaine, cooked cocaine, and possessed a firearm.

For the reasons stated below, as to this aspect of the motion, the Court finds that the United States more precisely recounts the facts of this case, and the law that governs it.

### 1. Legal Standard

"A combination of tips from an informant and first-hand corroborative observation of suspicious activity will provide probable cause . . . ." *United States v. McCraw*, 920 F.2d 224, 227 (4th Cir. 1990). In determining whether an anonymous tip gives rise to probable cause "the degree to which the report is corroborated is an important consideration." *United States v. Wilhelm*, 80 F.3d 116, 119 (4th Cir. 1996) (citing *United States v. Lalor*, 996 F.2d 1578, 1581 (4th Cir.)).

13

The Supreme Court in *Illinois v. Gates* adopted a totality of the circumstances standard to assess probable cause based on an anonymous tip. *Illinois v. Gates*, 462 U.S. 213 (1983). Under this analysis, courts must assess "whether officers had probable cause by examining all of the facts known to officers leading up to the arrest, and then asking 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer,' amount to probable cause." *United States v. White*, 549 F.3d 946, 950 (4th Cir. 2008) (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)). While "an informant's 'veracity,' 'reliability' and 'basis of knowledge' are all highly relevant in determining the value of [a complaint]," *Gates*, 462 U.S. at 230, they are not the only factors a court may consider, *White*, 549 F.3d at 950. *See also United States v. Miller*, 925 F.2d 695, 699 (4th Cir. 1991) ("[V]eracity, reliability, and basis of knowledge are highly relevant, but they are simply factors to be considered in examining the total information available to the arresting officer."). The Court must assess whether the corroboration of the tip provides "reasonable assurances that the informant was not fabricating the information" such that a reasonable officer could conclude "that the unverified portion of [the] tip [is] correct." *Miller*, 925 F.2d at 699.

"A very detailed tip, for example, may compensate for questions about the informant's reliability, and a tip that relies on hearsay may be deemed reliable if police later can corroborate it." *White*, 549 F.3d at 950 (citing *Gates*, 462 U.S. at 234, 241–42). Moreover courts, including the Supreme Court, acknowledge that "[i]nnocent behavior frequently will provide the basis for a showing of probable cause." *Gates*, 462 U.S. at 245 n.13.

The Supreme Court has counseled that reviewing courts must pay "great deference" to magistrates' findings of probable cause. *Id.* at 236. But the Fourth Circuit reminds us that such deference "does not mean that warrants based on conclusory allegations should be upheld:

'Sufficient information must be presented to the magistrate to allow that official to determine probable cause; his [or her] action cannot be a mere ratification of the bare conclusions of others.'" *Wilhelm*, 80 F.3d at 119 (quoting *Gates*, 462 U.S. at 239).

## 2. Analysis

The Gun 250 complaint purported to tie Jones to illegal activity inside the Berwyn Street residence. It did so in a detailed manner, indicating the observations were first-hand, with specifics as to interior rooms that could confirm that the complaint was based on first-hand knowledge. All of this serves as an indication that the complainant was reliable. *See White*, 549 F.3d at 950. When Jones answered the door, the Gun 250 complaint was immediately corroborated in three ways. Officer Myers recognized Jones, providing two points of confirmation: (1) Jones was present; and, (2) Jones was in the place the complaint identified. Further, upon opening the door, the police immediately smelled marijuana. This provided a vital, and third point of substantiation: the complaint indicated that marijuana would be present in the house with Jones. The smell of burning marijuana verified this. These three points of corroboration provided sufficient assurances for a reasonable officer to conclude that the unverified portions of the Gun 250 complainant were correct. *See Miller*, 925 F.2d at 699.

Jones unsuccessfully attempts to distinguish between possession of marijuana for commercial activity—*i.e.*, selling it—and possession for personal use. Jones argues that because the smell of burning marijuana indicates only that Jones *used* marijuana and not that he *sold* it, that smell cannot corroborate a complaint alleging that Jones *sold* marijuana. Jones points to no cases that draw such a fine line as to what might constitute corroboration. Nor can this Court view corroboration so myopically. Instead, the totality of these circumstances demonstrate that the relatively detailed Gun 250 complaint reliably and accurately identified that Jones could be

found at the Berwyn Street house, even mid-afternoon on a Wednesday. The smell of burning marijuana further verified the Gun 250 complainant's reliability despite the officers' lack of knowledge about the basis of the complainant's knowledge.[10]

## B. Detaining Jones in the Threshold of his Home Did Not Violate the Fourth Amendment[11]

Jones challenges his initial detention at the door of his residence, arguing that he "opened the door in order to determine the identity of the officers knocking on the door," and, in doing so, he "did not . . . surrender his reasonable expectation of privacy in the house." (Def.'s Supp. Br. 17.) Jones contends that when Officer Myers reached for Jones and handcuffed him, Officer Myers "pulled [Jones] from his home" and "effected a violation of the Fourth Amendment's protection of the home." (*Id.*) The United States counters, *inter alia,*[12] that "[Jones] was in the threshold," and that "[t]he police did not actually have to enter the home to detain [Jones]." (U.S. Supp. Resp. 13.) The United States correctly characterizes the initial encounter at Jones's door, and the applicable law, when making this argument.

---

[10] Jones contends that the Gun 250 complaint was "inherently unreliable" because Officer Pritchard told Jones that out of "'50 complaints . . . two of them might be true'" and that "'[w]e get more complaints from people that are just complaining on somebody than it is being real. They just want the police to mess with them.'" (Def.'s Supp. Br. 26 (quoting Body Camera Tr. Clip 3 at 11, Clip 5 at 2).) This argument does not persuade. Even if many of the complaints the Richmond Police Department receives through the Gun 250 program are unreliable, this complaint was accurate. Moreover, the officers here did not blindly rely on the anonymous complainant's allegations—they verified the accuracy of the complaint before acting on it.

[11] Jones initially challenged, albeit indirectly, the officers' approach of his home and the "knock-and-talk," which resulted in his opening the door and the smell of marijuana emanating from within. At oral argument, however, Jones abandoned this position, ceasing to challenge the knock-and-talk that preceded his detention.

[12] The United States also advances an argument under the doctrine of exigent circumstances and hot pursuit. Because the Court finds that Jones stood in the threshold of the residence at the time of detention and had no reasonable expectation of privacy, the Court need not reach these arguments at this stage of the analysis.

### 1.    Legal Standard

The United States Supreme Court has determined that a person does not have an

expectation of privacy while in the threshold of his or her home. In *United States v. Santana*,

427 U.S. 38, 42 (1976), the Supreme Court held that the warrantless arrest of a woman first seen

by officers from the street as she stood in the doorway of her house, but then followed by them

after they announced themselves and she retreated into her vestibule, did not violate the Fourth

Amendment. The Court explained:

> While it may be true that under the common law of property the threshold of
> one's dwelling is "private," as is the yard surrounding the house, it is nonetheless
> clear that under the cases interpreting the Fourth Amendment Santana was in a
> "public" place. She was not in an area where she had any expectation of privacy.
> . . . She was not merely visible to the public but was as exposed to public view,
> speech, hearing, and touch as if she had been standing completely outside her
> house.

*Id.* at 42 (citations omitted).

Jones seeks to distance his case from *Santana* by asserting, under *United States v.*

*McCraw*, 920 F.2d at 228, that he did not surrender his right to privacy simply by answering the

door. The case at bar, however, differs materially from *McCraw*.

### 2.    Analysis[13]

Jones's argument rests on one central assertion: that Officer Myers "clearly reached

across the threshold of the residence" in order to detain Jones, thereby violating the Fourth

Amendment. (Def.'s Supp. Br. 3.) The video and the still shots show that Jones stood in the

_____

[13] In both *Santana* and *McCraw*, the police had probable cause to arrest the defendant.
Here, although the officers only detained Jones, they similarly possessed sufficient probable
cause to arrest him, had they chosen to do so. As explained above, the Gun 250 complaint had
been sufficiently corroborated once Jones opened the door and the officers smelled marijuana.
At that point, the officers had reason to believe all information in the complaint was reliable,
giving rise to probable cause that Jones was in possession of illegal narcotics. Although Officer
Myers testified at the evidentiary hearing that if he had possessed probable cause for firearms
offenses or drug distribution, he would have included those crimes in the warrant, this does not
alter the Court's objective analysis of probable cause.

threshold—with the front door nearly closed behind him—as he initially spoke with officers. After they exchanged initial greetings and Officer Myers asked, "Are you smoking up in there," Officer Myers reached for Jones's left arm. (Body Camera Tr. Clip 7 at 1.) Thus, the officers detained Jones on the threshold, with the door open behind him, and Jones standing in full view of the public. Under *Santana*, Jones's arrest does not implicate the Fourth Amendment.

But Jones contends that Officer Myers ran afoul of *McGraw* when his hand breached the threshold as he grabbed Jones's shoulder. The Court cannot so find. First, even careful scrutiny cannot establish, with crystal clarity, whether Officer Myers reached "across" the threshold to grab Jones's arm. If he did, any "crossing" by Officer Myers's hand was negligible. Further, neither party contests—nor could they—that Officer Myers's feet remained entirely outside the threshold, and thus outside the interior of the house, during this first part of the encounter.

By contrast, in *McCraw*, officers *pushed through and entered* a hotel room in order to make a warrantless arrest for drug distribution after the defendant, standing entirely inside his hotel room and without fully opening the door, had attempted to close the door and retreat into the room. *McCraw*, 920 F.2d at 229. The United States Court of Appeals for the Fourth Circuit held that "a person does not surrender his expectation of privacy nor consent to the officers' entry by [answering the door], and that his arrest *inside his room* under such circumstances is contrary to the fourth amendment." *Id.* at 228 (emphasis added).

In any event, *Santana* does not appear to mandate the type of exacting frame-by-frame constitutional evaluation that Jones asks this Court to undertake. Not only would such an approach prove unmanageable but, more importantly, the court in *Santana* described "threshold" in broad terms that allow this Court to decide the case at bar. The *Santana* court called a threshold the entryway of a home where an occupant is "visible to the public [and] exposed to

18

public view, speech, hearing, and touch." *Santana*, 427 U.S. at 42. When Officer Myers grabbed Jones's arm, Jones stood on the doorframe, with the open door at his back, fully visible to anyone on the street. Jones was in the "threshold" of his home as defined by *Santana* when the officers detained him, meaning that his detention did not violate the Fourth Amendment.

## C. Neither the Need to Conduct a "Protective Sweep" nor Exigent Circumstances Justified the Officers' First Warrantless Entry of the Berwyn Street Residence Upon Detaining Jones

After the police had detained Jones and the children had been removed from the home, Officer Myers entered the house without a warrant in order to conduct a walk-thorough, or "sweep," of the residence. Jones contends that this sweep violated the Fourth Amendment.[14]

The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. The central requirement of the Fourth Amendment is reasonableness, and warrantless entries into a residence are presumptively unreasonable. *Payton v. New York*, 445 U.S. 573, 586 (1980). When a search or seizure is conducted without a warrant, the United States bears the burden to prove by a preponderance of the evidence that the search or seizure did not violate the Fourth Amendment. *Welsh v. Wisconsin*, 466 U.S. 740, 749–50, (1984); *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974). "[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Kentucky v. King*, 563 U.S. 452, 459 (2011) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)).

A number of carefully defined exceptions to the warrant requirement exist. The United States argues that two of those exceptions justified the officers' warrantless entry into Jones's

---

[14] During this sweep, Officer Myers observed a burning marijuana cigarette in the kitchen. He included this fact in the affidavit for the search warrant of Jones's home. This was the only evidence obtained during the sweep that Officer Myers included in the warrant affidavit.

house: (1) the police conducted a "protective sweep," and, (2) the police entered the house
pursuant to exigent circumstances. Jones contends that neither of these two exceptions to the
warrant requirement applies to Myers's warrantless sweep. Here, Jones presses the better
argument.

### 1. The Officers' Warrantless Entry was Not Justified as a "Protective Sweep"

#### a. Legal Standard

*Maryland v. Buie* articulates the standard the police must satisfy in order to conduct a
"protective sweep" of a home. Incident to arrest,[15] an officer can "look in closets and other
spaces immediately adjoining the place of arrest from which an attack could be immediately
launched" without probable cause or reasonable suspicion. *Maryland v. Buie*, 494 U.S. 325, 334
(1990). Beyond that, however, "there must be articulable facts which, taken together with the
rational inferences from those facts, would warrant a reasonably prudent officer in believing that
the area to be swept harbors an individual posing a danger to those on the arrest scene."[16] *Id.*

---

[15] *Buie* speaks of authorizing protective sweeps when police have arrested an individual.
Indeed, the *Buie* Court justified the intrusion of a protective sweep by noting that "[a] protective
sweep . . . occurs as an adjunct to the serious step of taking a person into custody for the purpose
of prosecuting him for a crime." *Buie*, 494 U.S. at 333.
    In contrast, all parties here agree that the officers merely detained Jones when the sweep
commenced; Jones had not been arrested. The difference need not drive the Court's analysis,
however. First, as concluded above, some basis to arrest Jones existed once the officers smelled
marijuana. Second, under *Buie*, it does not appear likely the sweep could be justified even had
Jones been under arrest when Officer Myers entered the home without a warrant.

[16] In *United States v. Jones*, for instance, the Fourth Circuit concluded that, after arrest, it
was reasonable for an officer to conduct a warrantless sweep of a house even though the
residents stated no other people remained in the house and the officer "did not see any evidence
of illegal drug activity and did not hear or see movement from within the house to indicate the
presence of other persons." 667 F.3d 477, 479 (4th Cir. 2012). In so ruling, the Fourth Circuit
found that the officers relied on specific articulable facts that could arouse a reasonable officer's
suspicion that "other dangerous individuals could" have been in the residence. *Id.* at 484. These
facts included: (1) recent surveillance revealing that known drug users had frequented the home;
(2) knowledge that some of those users "were known to carry firearms;" (3) knowledge that a

The scope of a protective sweep "extend[s] only to a cursory inspection of those spaces where a person may be found" and the sweep can "last[] no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." *Id.* at 335. Importantly, a "'[l]ack of information cannot provide an articulable basis upon which to justify a protective sweep.'"[17] *United States v. Jones*, 667 F.3d at 484 (quoting *United States v. Colbert*, 76 F.3d 773, 778 (6th Cir. 1996), and noting accord with *United States v. Moran Vargas*, 376 F.3d 112, 117 (2d Cir. 2004); *United States v. Chaves*, 169 F.3d 687, 692 (11th Cir. 1999)).

### b. Analysis

Officer Myers testified that he conducted the sweep "[f]or safety reasons." (Hr'g Tr. 64.) He explained that "[b]ecause we're going to be there for a while getting this search warrant[,] [f]or safety reasons, I'm not taking [Jones's] word" that no one else was in the house. (*Id.* at 82.) Officer Myers apparently believed that "[b]ased on the smell coming from the house, the door already being opened by a resident inside," the police "ha[d] enough to clear the house and make sure nobody else is in there as a threat." (*Id.*) While this Court has no reason to question Officer

---

fugitive from another state was staying at the house; and, (4) the presence of seven motorized vehicles outside the home despite the claim that no one else remained inside. *Id.* at 484–85.

[17] In *Buie,* officers entered Buie's house to execute an arrest warrant, fanning out throughout the house in search of him. One of the officers shouted down a set of stairs into the basement ordering anyone there to come out. Buie emerged from the basement and was arrested. At some point later, another officer went down into the basement "in case there was someone else" down there. *Buie*, 494 U.S. at 328. Once in the basement, the officer discovered inculpatory evidence in plain view.

Justice Stevens noted that the officer who conducted the search of a basement in *Buie* "supplied no explanation for why he might have thought another person was in the basement. The officer said only that he had no idea who lived there.'" *Id.* at 337–38 (Stevens, J., concurring). Writing alone in concurrence, Justice Stevens concluded that this lack of affirmative facts indicating someone was in the basement "suggest[ed] that no reasonable suspicion of danger justified the entry into the basement." *Id.* at 338.

Myers's subjective belief, his conduct nonetheless falls short of the objective test this Court must apply.

This record lacks evidence that police had "specific articulable facts" to undergird a reasonable suspicion that other dangerous individuals could be in the house. Before they conducted the sweep, Jones calmly informed officers that his niece and nephew were the only other individuals inside. When Jones called for them, they complied by coming onto the porch and sitting with the officers and Jones. No officers testified about seeing or hearing other activity, and nothing in Jones's demeanor conveyed nervousness or deceit. Moreover, the Gun 250 complaint did not include any information about people other than Jones being in the house, or about any other accomplices or person engaging in criminal conduct. The officers' desire to "not tak[e] [Jones's] word" that nobody else was present in the house, (Hr'g Tr. 82), cannot substitute for articulable facts supporting a reasonable suspicion that someone was *in fact* in the house. Accordingly, the Court cannot find that the United States has met its burden to show that the need to conduct a protective sweep of Jones's residence justified the warrantless entry.[18] *See Welsh*, 466 U.S. at 749–50.

---

[18] The United States argues that, because the officers corroborated the Gun 250 complaint, they had probable cause to believe that at least one firearm remained in the residence, posing an increased danger to officers on the scene and justified a protective sweep. This argument, however, ignores an important aspect of the touchstone requirement for protective sweeps: there must be articulable suspicion as to a dangerous person, not just of a weapon. *See Buie*, 494 U.S. at 334 (finding that, in order to conduct a sweep, officers must have "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept *harbors an individual posing a danger to those on the arrest scene*" (emphasis added)).

## 2.    The Officers' Warrantless Entry was Not Justified by Exigent Circumstances

### a.    Legal Standard

In the alternative, the United States contends that Officer Myers properly conducted a sweep of the house under exigent circumstances. However, the record falls short of establishing exigency, thereby leaving the United States unable to establish a basis to enter the home after the officers had secured Jones safely on the porch.

It is well settled that exigent circumstances create an exception to the Fourth Amendment's warrant requirement. Exigent circumstances justify a warrantless entry, *inter alia*, when police officers: (1) have probable cause to believe that evidence of illegal activity is present; and, (2) reasonably believe that evidence may be destroyed or removed before they could obtain a warrant. *See Turner*, 650 F.2d at 528.

In *United States v. Turner*, the Fourth Circuit identified several factors that should guide courts in determining if exigent circumstances exist, including:

> (1) the degree of urgency involved and the amount of time necessary to obtain a warrant; (2) the officers' reasonable belief that the contraband is about to be removed or destroyed; (3) the possibility of danger to police guarding the site; (4) information indicating the possessors of the contraband are aware that the police are on their trail; and[,] (5) the ready destructibility of the contraband.

*Id.* at 528.

### b.    Analysis

None of the *Turner* factors weigh in favor of a finding of exigent circumstances here. The police had no indication that anyone else was present in the house, so no appreciable "degree of urgency" existed, nor could they "have had a reasonable belief that the contraband

23

[wa]s about to be removed or destroyed."[19] *Id.* While it took some time for the officers to obtain

a search warrant in this case, the record cannot support a finding that, at the time he conducted

the sweep, Officer Myers was aware of facts that could support a reasonable belief that any

evidence would be removed or destroyed in the time it would take to obtain a warrant. The

record is devoid of any suggestion that the officers could reasonably have believed that anyone

in the house was "aware that the police are on their trail." *Id.* Indeed, Officer Myers candidly

testified that he conducted the sweep "[f]or safety reasons," (Hr'g Tr. 64), sans suggestion or

mention that he had any concern about the destruction of evidence.[20] The calm interaction

depicted in the video confirms that no unique "possibility of danger to police guarding the site"

existed. *See Turner*, 650 F.2d at 528. Finally, although drugs—the contraband the police

believed was inside the house—are generally readily destructible, this factor cannot weigh in

favor of exigent circumstances because the officers lacked an indication of someone inside the

home who could destroy the contraband. Accordingly, the Court cannot find that the United

States has met its burden to show that exigent circumstances existed.

---

[19] The United States argues that *United States v. Cephas*, 254 F.3d 488 (4th Cir. 2001), is
"directly on point and should be controlling here." (U.S. Supp. Resp. 14.) The factual
differences between *Cephas* and the case at bar, however, are significant. In *Cephas*, the Fourth
Circuit found that a warrantless entry into an apartment was justified when the officer reasonably
believed not only that marijuana was present in the residence, but also that: (1) one or more
adult males were present *inside* the apartment; (2) the occupants were aware that a police officer
was on the doorstep; and, (3) a fourteen-year-old girl was also inside and being given drugs.
*Cephas*, 254 F.3d at 495–96. Unlike in *Cephas*, the officers in the case at bar presented no
articulable facts that could have supported a reasonable belief that anyone else was inside the
residence. Accordingly, the Court cannot find that the outcome in *Cephas* controls here.

[20] The United States argues that the exigent circumstances test is objective, and the
subjective intent of the officers in entering the home is irrelevant to the Court's analysis. A
claim of irrelevance overstates the legal test. A court may evaluate, for instance, whether officer
testimony about the fear that evidence would be destroyed can, alongside other evidence, provide
suitable footing for a finding that a reasonable officer could have believed destruction of
evidence might occur.

Because the police entered the house without a search warrant and no valid exception to the warrant requirement existed, the Court concludes that the warrantless sweep of the Berwyn Street residence violated the Fourth Amendment. Accordingly, the fruits of this illegal search must be excluded. Because the odor of burning marijuana and the information in the Gun 250 complaint preceded this entry, the Court must exclude only the fruits of the illegal entry: the burning marijuana cigarette.

### D.    The Search Warrant Remains Valid

The Court's analysis continues, then, by evaluating the search warrant without the information about the marijuana cigarette. Jones contends that, once excised of the illegally obtained evidence, the search warrant for the Berwyn street residence lacks sufficient probable cause to justify the search. He also argues that, even if sufficient probable cause existed to support the warrant, the warrant was overbroad because the search authorized by the warrant was inconsistent with the crime listed.

The Court concludes otherwise. For the reasons stated below, the warrant supports probable cause to search the Berwyn street residence, even without the information about the unlawfully obtained evidence. Further, the evidence uncovered in the search is admissible even if the warrant were overbroad as Jones claims.

### 1.    Legal Standard

A court evaluating whether probable cause exists for a warrant to issue must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before [the court], including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238 (internal citations and quotation marks omitted).

25

When an affidavit for a warrant contains illegally obtained information, the reviewing court must first excise the tainted information. *United States v. Gillenwaters*, 890 F.2d 679, 681 (4th Cir. 1989) (citing *Franks v. Delaware*, 438 U.S. 154, 171–72 (1978)). Next, the court must review the remaining information in the warrant, and determine if the totality of the circumstances presented in the "untainted portion of the affidavit supports a finding of probable cause to issue the search warrant." *Id.* at 682. If the court determines that probable cause exists, the evidence obtained pursuant to the search warrant will not be excluded. *Id.*

> ### 2. Even After Excluding Evidence Unlawfully Obtained During the Warrantless Sweep, the Affidavit Supports a Finding of Probable Cause

Even after excising the unlawfully obtained information—the evidence of the burning marijuana cigarette—the totality of the circumstances presented in the untainted portions of the affidavit contains sufficient probable cause of marijuana possession.

The excised warrant included information that the police smelled marijuana emanating from the residence, which alone is almost certainly enough to give rise to probable cause of drug possession.[21] *See United States v. Humphries*, 372 F.3d 653, 658 (4th Cir. 2004) ("We have repeatedly held that the odor of marijuana alone can provide probable cause to believe that marijuana is present in a particular place."); *Cephas*, 254 F.3d at 495 (noting that that the strong smell of marijuana emanating from an open apartment door "almost certainly" gave rise to probable cause to believe that marijuana was *present* in the apartment). The magistrate could have also reasonably relied on information included in the warrant from the corroborated Gun 250 complaint. The Gun 250 complaint contained significant information that could give

---

[21] Even without the Gun 250 complaint, the officers almost certainly had sufficient probable cause to support a search warrant for drug possession based on the smell of marijuana alone.

rise to probable cause that Jones possessed marijuana, including statements that: (1) the complainant had seen Jones cooking narcotics; (2) Jones kept cooking utensils in a safe in his closet of the residence; and, (3) Jones stored drugs throughout the house. [22]

Accordingly, the sworn statements in the affidavit in support of the search warrant, including the information in the corroborated Gun 250 complaint, and the smell of burning marijuana upon Jones opening the door provided, objectively, probable cause to believe that Jones possessed marijuana.

### 3. The Court Need Not Reach the Question of Whether the Warrant Was Overbroad

Jones contends that the search warrant was overbroad for two reasons. First, he argues that the scope of the search the warrant authorized did not match the crime listed, simple possession of marijuana. Specifically, the warrant allowed for the search of firearms and ammunition—items not necessarily implicated by possession of marijuana. Second, Jones contends that the probable cause the officers had supported a search only for *actively burning* marijuana. Based on this theory, Jones claims that the search of drawers and safes exceeded the scope of the probable cause.

The United States advances two arguments in response. First, the United States posits that the decision to list only the crime of possession crime is not determinative because the *affidavit* contained sufficient probable cause to search for evidence of both drug distribution and drug possession. Second, the United States invokes the doctrine of inevitable discovery, contending that, even if the warrant was compromised by Officer Myers's failure to list a distribution crime on the warrant, all of the evidence of drug distribution—guns, packaging

---

[22] The Gun 250 complaint also included allegations the Jones kept a firearm in the home and that the complainant had seen Jones selling narcotics. This likely gave the officers probable cause that Jones was distributing drugs and that he was in possession of a firearm, but the Court need not make this finding.

27

materials, etc.—would have been discovered in a search conducted pursuant to a more narrow

warrant that authorized a search only for evidence of possession of marijuana. According to the

United States, in searching for marijuana, the police would have searched in the same places they

searched under the broader warrant that actually issued.

The United States did not invoke the doctrine of inevitable discovery until oral argument

on the Motion to Suppress. The parties addressed this new theory in subsequent briefing.

Having reviewed the parties' submissions, the Court concludes that inevitable discovery does not

govern its analysis.[23]  Instead, the doctrine of severability more appropriately pertains.

> a.  **Even if the Lack of Congruence between the Crime Listed and the Scope of the Search Rendered the Warrant Overbroad, the Doctrine of Severability Would Permit Admission of All Evidence Seized**

Jones's overarching position contends that the scope of the search the warrant authorized

did not match the crime listed:  simple possession of marijuana. Specifically, the warrant

---

[23] The exclusionary rule does not prevent the prosecution from relying on unlawfully obtained evidence "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *Nix v. Williams*, 467 U.S. 431, 444 (1984); *United States v. Whitehorn*, 813 F.2d 646, 650 (4th Cir. 1987). While "[a] finding of inevitable discovery necessarily rests on facts that did not occur[,] . . . by definition the occurrence of these facts must have been likely, indeed 'inevitable,' absent the government's misconduct." *United States v. Allen*, 159 F.3d 832, 840 (4th Cir. 1998). Moreover, "[t]he inevitable discovery doctrine cannot rescue evidence obtained via an unlawful search simply because probable cause existed to obtain a warrant when the government presents *no* evidence that the police would have obtained a warrant. Any other rule would emasculate the Fourth Amendment." *Id.* at 842.

Here, the officers believed their warrant comported with the Fourth Amendment. No evidence suggests that they were planning to seek another warrant that was tailored narrowly to the crime of simple drug possession. The argument the United States asserts—that a hypothetical warrant for simple possession would have uncovered the same evidence— "necessarily rests on facts that did not occur." *Allen*, 159 F.3d at 840. The United States, therefore, cannot establish by a preponderance of the evidence that the "information ultimately or inevitably would have been discovered by lawful means." *Nix*, 467 U.S. at 444.

That said, the practical upshot is the same. Even presuming the police could have searched only places consistent with a warrant tailored narrowly to drug possession, they would have been authorized to search in the same places that the "broader" warrant permitted.

allowed for the search of firearms and ammunition—items not necessarily implicated by possession of marijuana. Jones's argument founders because all evidence the officers uncovered in the search of the Berwyn residence would have been properly uncovered in a search pursuant to a warrant severed of the parts to which Jones objects.

### i.     Legal Standard:  Severability of a Partially Invalid Warrant

"'When a warrant is severable, the portion of the warrant that is constitutionally infirm—usually for lack of particularity or probable cause—is separated from the remainder and evidence seized pursuant to that portion is suppressed; evidence seized under the valid portion may be admitted.'"[24] *United States v. Powers*, 1 F. Supp. 3d 470, 478 (M.D.N.C. 2014) (quoting *United States v. Galpin*, 720 F.3d 436, 448 (2d Cir. 2013)); *see also United States v. Sells*, 463 F.3d 1148, 1155 (10th Cir. 2006) ("[E]very federal court to consider the issue has adopted the doctrine of severance, whereby valid portions of a warrant are severed from the invalid portions and only materials seized under the authority of the valid portions, or lawfully seized while executing the valid portions, are admissible.").

Total suppression of a partially valid warrant may nevertheless be required "if the invalid portions so predominate the warrant that the warrant in essence authorizes 'a general, exploratory rummaging in a person's belongings.'" *Sells*, 463 F.3d at 1158 (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971)); *see also United States v. Kow*, 58 F.3d 423, 428 (9th Cir. 1995) ("[S]everance is not available when the valid portion of the warrant is a relatively insignificant part of an otherwise invalid search." (internal citation and quotation marks omitted)).

---

[24] Commentators agree, observing that "it would be harsh medicine indeed if a warrant issued on probable cause and particularly describing certain items were to be invalidated in toto merely because the affiant and magistrate erred in seeking and permitting a search for other items as well." Wayne R. LaFave, *2 Search & Seizure* § 4.6(f) (5th ed. 2012).

In assessing whether the invalid portions of the warrant predominate, the court focuses its analysis "on the warrant itself rather than upon an analysis of the items actually seized during the search." *Sells*, 463 F.3d at 1159 (citing *United States v. Brown*, 984 F.2d 1074, 1078 (10th Cir. 1993)). The court's inquiry is both qualitative and quantitative: the number of "valid versus invalid provisions is one element in the analysis of which portion makes up the greater part of the warrant," but the court must also consider "the relative scope and invasiveness of the valid and invalid parts of the warrant." *Id.* at 1159–60 (internal citations and quotation marks omitted).

## ii.    Analysis

Assuming, *arguendo*, that Jones's challenge to the incongruence between the crime listed on the warrant and the items for which the warrant authorized the officers to search rendered the warrant overbroad, under the doctrine of severability, all evidence uncovered in the search would still be admissible.

The warrant authorized officers to search for the following:

A) "Any controlled substances (marijuana)"

B) "[A]ny paraphernalia *used* in the use of illegal narcotics;"

C) "Any instruments *used* in the illegal drug usage of marijuana or any other illegal substance;"

D) "Any electronic devices used to aid in the *usage* of illegal narcotics;"

E) "[A]ny firearms and ammunition;"

F) "[A]ny financial records and any written records identifying any person(s) involved in the illegal drug *use* and/or indicating residence in the dwelling;" and,

30

G) "Also any safes or locked boxes that could aid in the *hiding* of illegal narcotics."

(Warrant 1 (emphases added).)

Jones argues in the extreme that the warrant's "authorization to search for any other violations of the Virginia drug possession statute transformed it into a general warrant." (Def.'s Supp. Br. 30.) In briefing, Jones did not specify to which items within the warrant's scope he objects. [25] However, at oral argument, Jones focused on the warrant's authorization to search for "any firearms or ammunition." Indeed, all other portions of the warrant—as separated and emphasized above—are explicitly tied to the use or possession of marijuana.

Severing the portion of the warrant to which Jones objects would not necessitate suppression of any evidence. First, the portion authorizing a search for "any firearms or ammunition" does not "so predominate the warrant that the warrant in essence authorizes 'a general, exploratory rummaging in a person's belongings.'" *Sells*, 463 F.3d at 1158 (quoting *Coolidge*, 403 U.S. at 467). Those two items make up a fraction of the items to be seized listed on the warrant. Further, the inclusion in the warrant of "any firearms and ammunition" did not increase the scope or invasiveness of a search under the other parts of the warrant alone. *See Sells*, 463 F.3d at 1160. Because the Gun 250 complaint indicated that Jones kept drug cooking utensils in a safe in his closet—items which would facilitate drug *use*—the officers undoubtedly

---

[25] Elsewhere in briefing, Jones argues that "[t]he warrant here was ridiculously broad. The warrant alleged only probable cause for simple possession of marijuana; yet it authorized the search and seizure of things such as 'financial records,' and 'electronic devices' used to aid drug use, and firearms." (Def.'s Supp. Br. 27 (quoting Warrant 1).) This contention related to the lack of probable cause to search, not the incongruence between the crime listed on the warrant and the scope of the search the warrant authorized. Regardless, the search for records and devices authorized by the warrant were expressly related to the use, rather than sale, of marijuana. (*See* Warrant 1 ("Any electronic devices used *to aid in the usage* of illegal narcotics, . . . any financial records and any written records *identifying any person(s) involved in the illegal drug use* and/or indicating residence in the dwelling." (emphases added).) Accordingly, these provisions of the warrant need not be severed under Jones's incongruence argument.

31

had probable cause to search the safe for evidence of drug possession alone. Therefore, because the gun was found in the safe, severing the warrant of "any firearms and ammunition" would not justify the exclusion of any evidence found in the safe, including the firearm.

Moreover, it is uncontested that based on the corroborated Gun 250 complaint, had the officers found a firearm in the safe during a search only for marijuana, they could have properly seized a gun even if "any firearms and ammunition" had not been enumerated in the search warrant. *See Horton v. California*, 496 U.S. 128, 133 (1990); *United States v. Taylor*, 90 F.3d 903, 908 (4th Cir. 1996). Possession of a gun by a drug user is unlawful under Virginia law.[26] Moreover, Jones is a felon and the record indicates that the officers who conducted the search knew this, at least at the time they conducted the search.[27]

Therefore, even after severing the portion of the warrant's scope to which Jones objects as overbroad, all evidence seized during the search would still be admissible because the officers had probable cause to search all the places they did based only on the parts of the warrant that authorized a search for marijuana alone.

---

[26] Virginia law makes it a felony for "any person unlawfully in possession of a controlled substance classified in Schedule I or II of the Drug Control Act . . . to simultaneously with knowledge and intent possess any firearm." Va. Code § 18.2-308.4. During their search, the officers found cocaine, a Schedule II substance under the Drug Control Act, Va. Code § 54.1-3448.

[27] Federal law makes it a crime for any person "who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year" to possess a firearm. 18 U.S.C. § 922(g)(1). It appears from the record that at least Officer Pritchard and Officer Hogan—both of whom participated in executing the search warrant—knew that Jones was a felon. (*See* Body Camera Tr. Clip 7 at 17 ("OFFICER PRITCHARD: Yeah. Oh, is he a felon? OFFICER HOGAN: Yeah.").)

### b. The Officers Had Probable Cause to Search the Residence for Both Burning and Fresh Marijuana

In the alternative, Jones utilizes a novel theory to contend that the officers had probable cause to search only for *actively burning* marijuana. Based on this theory, Jones claims that the search of drawers and safes exceeded the scope of the probable cause. This argument founders. The Gun 250 complaint, corroborated when the officers approached the residence and smelled marijuana, gave the officers probable cause to believe that there was fresh, unburnt marijuana in the house because the complaint claimed that Jones stored drugs throughout the house.

### E. Jones's *Miranda* Rights Were Not Violated

Jones contends that his statements to both Detective Awad and Officer Myers should be suppressed because the officers violated his Fifth Amendment rights, or alternatively, his Fourth Amendment rights. The United States argues that no violation of the Fourth or Fifth Amendment occurred and all of Jones's statements are admissible.

#### 1. Legal Standard

##### a. Applicability of *Miranda* Rights

"'A confession made during a custodial interrogation will be suppressed unless police advise the defendant of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), and the defendant knowingly, intelligently, and voluntary waives those rights.'" *United States v. Giddins*, 858 F.3d 870, 879 (4th Cir. 2017) (citation altered) (quoting *United States v. Holmes*, 670 F.3d 586, 591 (4th Cir. 2012)).

*Miranda* concerns about the voluntary nature of a statement arise only when a defendant is in custody and subjected to interrogation. *Id.* at 879. "When deciding whether a defendant not under formal arrest was in custody—and thus if the *Miranda* requirements apply—a court asks

33

whether under the totality of the circumstances, a suspect's freedom of action was curtailed to a degree associated with formal arrest."[28] *Id.* (internal quotation marks omitted).

> *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. . . . [T]he term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.

*Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980) (footnotes omitted). In contrast,

"'[v]olunteered statements of any kind are not barred by the Fifth Amendment.'" *Id.* at 300

(quoting *Miranda*, 384 U.S. at 478).

### b. Invocation and Waiver of *Miranda* Rights

A suspect must invoke his or her *Miranda* rights "'unambiguously.'" *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010) (quoting *Davis v. United States*, 512 U.S. 452, 459 (1994)). Conversely, a suspect's "ambiguous or equivocal" statements do not constitute an invocation of his or her rights. *Id.* (quoting *Davis*, 512 U.S. at 461–62.) A suspect may invoke his or her right to remain silent "at any time prior to or during questioning," and once he or she does so, "the interrogation must cease." *Miranda*, 384 U.S. at 474.

Waiver of the right to remain silent may be explicit or implicit. *Berghuis*, 560 U.S. at 384 ("An 'implicit waiver' of the 'right to remain silent' is sufficient to admit a suspect's statement into evidence." (quoting *North Carolina v. Butler*, 441 U.S. 369, 376 (1979))). An implicit waiver of the right to remain silent may be inferred through "the defendant's silence, coupled with an understanding of his [or her] rights and a course of conduct indicating waiver." *Butler*, 441 U.S. at 373. However, merely showing that *Miranda* warnings were given and the accused made an uncoerced statement is insufficient to demonstrate waiver; "[t]he prosecution

---

[28] Neither party contests that Jones was in custody for purposes of *Miranda*.

34

must make the additional showing that the accused *understood* these rights. *Berghuis*, 560 U.S. at 384 (emphasis added).

Any waiver of the right to remain silent—whether explicit or implicit—must be made "voluntarily, knowingly[,] and intelligently." *Miranda*, 384 U.S. at 444. To determine whether a suspect has made a voluntary, knowing, and intelligent waiver, the Court must engage in two inquiries. The Court must determine whether: (1) the relinquishment of the right was "'voluntary in the sense that it was the product of free and deliberate choice rather than intimidation, coercion, or deception;'" and, (2) the waiver was "'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" *Berghuis*, 560 U.S. at 382–83 (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).

### c.     **Duration of *Miranda* Warnings**

The police need not re-advise a suspect of his or her rights when an interrogation does not immediately follow the *Miranda* warning or when there is a delay in the interrogation. Courts in this circuit and others have upheld lapses of multiple hours between warnings and interrogation. *United States v. Frankson*, 83 F.3d 79, 83 (4th Cir. 1996) (holding that the defendant's "initial *Miranda* warning was in no way compromised by the passage of two and one-half hours between the issuance of his warning and the point at which he began to confess his crimes"); *see also Jarrell v. Balkcom*, 735 F.2d 1242 (11th Cir. 1984) (finding three hours between warning and cooperation acceptable); *United States ex rel. Henne v. Fike*, 563 F.2d 809, 814 (7th Cir. 1977) (finding nine hours between warning and cooperation acceptable). Moreover, interrogation by a different person from the individual who gave the warnings does not compromise the efficacy of *Miranda* warnings. *See United States v. Stuck*, 227 F. App'x 219,

35

223 (4th Cir. 2007) (holding that *Miranda* warnings read by state police officers were still valid when city police officers questioned the defendant two hours later).

### d.  United States' Burden of Proof

When a defendant moves to suppress his or her statement on the basis that the statements were obtained in violation of his or her right to remain silent, the government bears the burden of establishing by a preponderance of the evidence that the statement was not obtained in violation of *Miranda*. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986).

### 2.  Detention on the Couch Inside the Residence

Jones first suggests that when the officers asked him to sit on the couch inside the house minutes after his detention and accompanied him into the living room, they were present in the residence without a warrant or exigent circumstances and in violation of the Fourth Amendment. (Def.'s Supp. Br. 16.) Jones argues that his statements should be suppressed "because they were the fruit of an intrusion into his home in violation of the Fourth Amendment." (*Id.*) The United States did not respond to this argument. Nonetheless, the Court finds that Jones's argument founders because his initial detention was lawful and supported by probable cause.

### a.  Legal Standard

Separate and apart from any *Miranda* concerns, "'statements given during a period of illegal detention are inadmissible even though voluntarily given if they are the product of the illegal detention and not the result of an independent act of free will.'" *Florida v. Royer,* 460 U.S. 491, 501 (1983).

In *Brown v. Illinois*, the Supreme Court balanced Fourth and Fifth Amendment principles when holding that *Miranda* warnings, by themselves, are not sufficient to attenuate the taint of an illegal arrest and that, without more, any subsequent confession is the fruit of the initial

36

Fourth Amendment violation, *i.e.*, the unlawful seizure. 422 U.S. 590, 605 (1975); *see also Dunaway v. New York*, 442 U.S. 200, 218 (1979) (holding that *Miranda* warnings did not dissipate the taint of a seizure made without probable cause). The *Brown* Court explained, "[i]f Miranda warnings, by themselves, were held to attenuate the taint of an unconstitutional arrest, regardless of how wanton and purposeful the Fourth Amendment violation, the effect of the exclusionary rule would be substantially diluted." *Brown*, 422 U.S. at 602.

### b. **Analysis**

For purposes of this argument, Jones contends that the officers should not have been in the living room of his home without a warrant during his detention. However, the cases holding that statements given during a period of illegal detention are inadmissible despite *Miranda* warnings do not pertain. In those cases, courts found that *Miranda* warnings did not dissipate the taint of a seizure that was unlawful because the police lacked probable cause to arrest the individual. *See, e.g.*, *Brown*, 422 U.S. at 605; *Dunaway*, 442 U.S. at 218.

In *Brown*, officers broke into the defendant's empty residence without a warrant and arrested him, guns drawn, without probable cause when he returned home. *Brown*, 422 U.S. at 592–93. One officer stood outside the house and another stood inside. *Id.* at 593. Notably, the court in *Brown* found that officers' illegality in arresting him without probable cause "had a quality of purposefulness" and that the "impropriety of the arrest was obvious." *Id.* at 605. In *Dunaway*, the police arrested the defendant without probable cause, presenting a situation the court characterized as a "virtual[] . . . replica of the situation in *Brown*." *Dunaway*, 442 U.S. at 218.

Here, the officers clearly had probable cause to arrest Jones, even though they chose only to detain him. Moreover, there is no hint—either on the body camera footage or in the officers'

testimony—of any illegality with a "quality of purposefulness" like that present in *Brown. See Brown*, 422 U.S. at 605. Both Jones and the officers remained calm and non-confrontational throughout the encounter. Jones asks the Court to find that an alleged violation of the warrant requirement, which occurred after his initial lawful detention, somehow taints statements he subsequently made. The Court does not read the case law to extend so far, and Jones provides no persuasive argument for the Court to so find.

### 3. The Court Cannot Find that the Police Engaged in a Two-Step *Miranda* Interrogation

Jones argues that his statements to Detective Awad were obtained through a deliberate two-step interrogation. The United States avers that "[t]here is absolutely no evidence that any of the officers or the detective deliberately implemented a two-step interrogation." (U.S. Supp. Resp. 25.) The record cannot support a finding that the officers engaged in any deliberate two-step interrogation.

#### a. Legal Standard

In *Missouri v. Seibert*, the Supreme Court held inadmissible statements the police obtained through a "two-step" Miranda procedure, described as "question first and warn later." 542 U.S. 600 (2004). In *Seibert*, a detective exhaustively questioned Seibert until she confessed to murder. *Id.* at 605. The detective then read Seibert her *Miranda* warnings and re-questioned her, having her repeat her prior confession. *Id.* The *Seibert* Court held that Seibert's second confession was inadmissible as evidence against her even though it was preceded by a *Miranda* warning. *Id.* at 614. A four-justice plurality found this tactic designed "to render *Miranda* warnings ineffective by waiting for a particularly opportune time to give them, after the suspect has already confessed." *Id.* at 611. The plurality reasoned that "[u]pon hearing warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he

38

[or she] had a genuine right to remain silent, let alone persist in so believing once the police began to lead him [or her] over the same ground again." *Id.* at 613. The plurality further held that the admissibility of warned statements made after unwarned statements should depend "on whether *Miranda* warnings delivered midstream could be effective enough to accomplish their object," taking into account

> [(1)] the completeness and detail of the questions and answers in the first round of interrogation, [(2)] the overlapping content of the two statements, [(3)] the timing and setting of the first and the second, [(4)]the continuity of police personnel, and [(5)] the degree to which the interrogator's questions treated the second round as continuous with the first.

*Id.* at 615.

Justice Kennedy concurred in the result, but wrote separately to emphasize that the plurality's multi-factor test, which would apply to both intentional and unintentional two-stage interrogations, was too broad. *Id.* at 621–22 (Kennedy, J., concurring). Instead, Justice Kennedy proposed limiting the applicability of the test and any subsequent finding of inadmissibility to situations in which the two-step interrogation was shown to be deliberate. *Id.* The Fourth Circuit adopted Justice Kennedy's more narrow view in *United States v. Mashburn*, holding that "[i]f [the two-step] strategy is *deliberately* employed, postwarning statements related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statements are made." 406 F.3d 303, 309 (4th Cir. 2005) (emphasis added).

### b.    Analysis

#### i.    No Evidence Exists that Jones was Interrogated Before Being Read his *Miranda* Rights

It is clear, based on the nature of the subsequent conversation recorded on the body camera, that Detective Awad heard Jones say something about a gun and cocaine during their conversation alone in the house together. However, Detective Awad never testified that Jones

39

made *no* statements to him during their first conversation; rather, Detective Awad testified that Jones *did* start to make incriminating statements and at that moment, Detective Awad stopped the conversation, called in Officer Pritchard, and read Jones his *Miranda* rights.

Moreover, Detective Awad testified that, to the best of his recollection, he did not interrogate Jones before to reading Jones his *Miranda* rights. The Court finds Detective Awad credible generally, and particularly on this point. During his testimony about the timing of the *Miranda* warnings, Detective Awad spoke about his general practices during his career as a detective. He also demonstrated an awareness of the purpose of *Miranda* and articulated convincingly an understanding that it was in his own best interest to ensure that he complied with *Miranda* in all his encounters with suspects. The Court affords due weight to Detective Awad's testimony. On this record, the Court cannot find sufficient evidence to support a finding that Detective Awad even interrogated Jones during their first conversation.

### ii. No Evidence Exists to Show that a Two-Step Strategy was *Deliberately* Employed

Jones argues that the hand motions Officer Hogan appeared to be making at Detective Awad through the screen door establishes that the officers deliberately employed a two-step interrogation strategy. Jones suggests that, these motions, Officer Hogan offered to have Officer Pritchard come in with his body camera, but that his movements confirm that Detective Awad said no. Jones implies that Detective Awad purposely excluded the body camera from the house in order to interrogate Jones off-camera, then later brought the camera in to warn Jones and obtain a valid confession.

As a threshold matter, the video does not definitively establish what Officer Hogan was doing, nor does it establish Detective Awad's intent. Detective Awad could not remember this interaction when he testified and could not speak to the substance of it. Moreover, even

assuming that the officers employed a two-step strategy, these hand motions do not show that they *deliberately* employed that strategy.

This is true in part because the record reflects equally probable scenarios. Detective Awad testified that when he was in the house with Jones alone, he was attempting to get consent to search. It is reasonable that Detective Awad, in trying to build rapport with Jones, would not benefit from having two more uniformed officers in the room. It is also possible that what Jones characterizes as Detective Awad's "denial" could have reflected Detective Awad's indication that Officers Hogan and Pritchard should not come in to search because Jones had denied consent. This latter explanation comports with Detective Awad's testimony. Given the fact that the hand motions are subject to multiple interpretations and that the Court finds the officers credible, the Court cannot use this moment to make a finding of deliberate employment of two-step strategy.

Accordingly, the Court cannot find that sufficient evidence exists to support a finding that, even if the police employed a two-step interrogation tactic, they did so deliberately.

### iii. The *Seibert* Factors Weigh in Favor of Admitting Jones's Statements

Even assuming that Detective Awad's first conversation with Jones constituted an interrogation and that the officers deliberately employed a two-step strategy, the Court would still decline to suppress Jones's statements. An application of the *Seibert* factors weighs in favor of admission.

The first factor, "the completeness and detail of the questions and answers in the first round of interrogation," weighs against suppressing Jones's statements. *Seibert*, 542 U.S. at 615. The first round of interrogation—when Detective Awad was in the house with Jones alone— lasted only three-and-a-half minutes and would not have afforded Detective Awad time to

41

conduct a complete and detailed interrogation. The next three factors, "the overlapping content of the two statements," "the timing and setting of the first and the second [interrogations]," and "the continuity of police personnel," are largely satisfied here. *Id.* As already discussed, the statements about the cocaine and gun overlapped, the timing of the two statements was essentially continuous, and the same police officer, Detective Awad, conducted both interrogations.

The last factor, "the degree to which the interrogator's questions treated the second round as continuous with the first," weighs heavily in favor of admission. *Id.* Detective Awad went to substantial lengths to explain to Jones the significance of his *Miranda* warnings, saying, "[t]here's no federal court and there's no lower court, there's no court in this country that will let me talk to you and help you without giving you your rights. *Anything you said up until then, I'm not going to use because I can't.*" (Body Camera Tr. Clip 6 at 1–2 (emphasis added).) Detective Awad emphasized to Jones, "it's entirely up to you. If you want to talk about it again . . . ." (*Id.* at 2.) These statements effectively vitiate the central concern animating the *Seibert* court's holding: "*Miranda* warnings [are rendered] ineffective by waiting for a particularly opportune time to give them, after the suspect has already confessed." *Seibert*, 542 U.S. at 611. Indeed, Detective Awad's statements do the exact opposite: they make clear to Jones that anything incriminating he said before the warnings were given would not, and perhaps more importantly, *could not*, be used against him.

The Court affords the first and last factor substantial weight, and on balance, finds that the *Seibert* factors weigh in favor of admitting Jones's statements. For the foregoing reasons, the Court finds that Jones's statements were not obtained through an impermissible two-step "question first and warn later" interrogation. Moreover, even if the officers did employ a

prohibited two-step interrogation tactic, the *Seibert* factors weigh in favor of admitting Jones's statements.

### 4. Jones's Equivocal "No" was Insufficient to Invoke his *Miranda* Rights, and Even if he had Properly Invoked His Rights, Jones Would Have Waived Them by Subsequently Volunteering Statements

Jones argues that he "invoked his right not to speak with the officers unambiguously" when he answered "no" after Detective Awad read him his *Miranda* rights, and that all of Jones's statements should therefore be suppressed. (Def.'s Supp. Br. 13.) Alternatively, Jones argues that, even if he did waive his rights, the United States "cannot meet its burden to show that [he] understood his rights before speaking." (*Id.* at 14.)

Although the United States does not identify the moment at which Jones waived his rights, it argues that, "[o]nce advised of *Miranda,* [Jones] indicated that he understood his rights. [Jones] seemed to be still thinking about whether he wanted to cooperate and/or consent to the search. But [Jones] continued to have conversations with the detective." (U.S. Supp. Resp. 26.)

After Detective Awad read Jones his *Miranda* rights, he asked Jones a compound question: "Do you understand these rights? With these rights in mind, do you wish to speak to me now? You have to answer yes or no." Jones responded: "No. (Inaudible)." (Body Camera Tr. Clip 6 at 1.) The video shows that Jones said something after saying "no," but all parties candidly admit that they could not hear or transcribe correctly the words that Jones uttered.

Jones contends that his response of "no" was an unequivocal invocation of his right to remain silent. In doing so, Jones ignores that he said something, albeit unidentifiably, after he said "no." The Court concludes that, at best, the "no" was an ambiguous invocation that was insufficient to invoke Jones's right to remain silent. *Berghuis,* 560 U.S. at 381. First, Jones says something inaudible directly after saying "no." Second, Jones responded "no" in answer to a

compound question: "Do you understand these rights? [And, w]ith these rights in mind, do you wish to speak to me now?" (Body Camera Tr. Clip 6 at 1.) Thus, to the extent that Jones answered "no," it was not an unequivocal invocation of his right to remain silent, as he did not clarify to which of the two questions he was responding.[29] Moreover, the body camera footage of this exchange shows that the conversation was casual and that the officers and Jones were calm throughout the entire police encounter.

Regardless, even if Jones had unambiguously invoked his right to remain silent, he subsequently waived it. Moments later in the conversation, Jones, unprompted, said, "Hey, I mean, I've been in possession of it," referencing a gun. (*Id.* at 2.) At this point, Detective Awad began asking direct questions that constituted interrogation, and these questions elicited incriminating responses from Jones. The dispositive question, therefore, would be whether Jones waived his right to remain silent when he volunteered the statement, "Hey, I mean, I've been in possession of it." The Court finds that he did waive his right.

Jones's statement "Hey, I mean, I've been in possession of it" was uncoerced and reinitiated the interrogation. However, merely showing that Jones made an uncoerced statement after being advised of *Miranda* is insufficient to demonstrate waiver; "[t]he prosecution must make the additional showing that the accused understood these rights." *Berghuis*, 560 U.S. at 384. Here, the Court is satisfied that Jones understood his rights.

Jones showed an awareness and understanding of his rights throughout the police encounter. First, when Officer Myers indicated his intent to conduct a warrantless sweep of the residence, Jones asked, "You got a warrant or something? . . . I don't get a search? Did you get a

---

[29] Jones makes the related argument that his negative response to Detective Awad's compound question after reading the *Miranda* warnings could be read to mean that Jones did not understand his rights. This aspect of the ambiguity in his response does not run in favor of suppression. Even if this were Jones's intended response, for the reasons articulated, the Court finds that the totality of the circumstances reveals that Jones did in fact understand his rights.

call or something?" (Body Camera Tr. Clip 7 at 2.) Furthermore, Jones declined to consent to Officer Myers's or Detective Awad's request to fully search the home without a warrant. This not only demonstrates an understanding of his rights, but also helps confirm the voluntariness of his subsequent statements to both officers. Jones's refusal to give consent to search the home signals that he felt some agency to resist the police. This indicates that when he did choose to speak with Detective Awad, it amounted to a voluntary choice. The Court finds that Jones voluntarily, knowingly, and intelligently waived his right to remain silent, and his statements to both Detective Awad and Officer Myers are admissible.

## III. Conclusion

For the foregoing reasons, the Court will deny the Motion to Suppress. (ECF No. 14.) An appropriate Order shall issue.

/s/

M. Hannah Lauck
United States District Judge

Date: **2/16/18**
Richmond, Virginia

45